## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**NORTH ALABAMA FABRICATING COMPANY, INC.,**

            **Plaintiff,**

**v.**

**BEDESCHI MID-WEST CONVEYOR COMPANY, LLC, et al.,**

            **Defendants.**

**Case No. 16-2740-DDC-TJJ**

## MEMORANDUM AND ORDER

Plaintiff North Alabama Fabricating Company, Inc. brings this lawsuit, asserting breach of contract and fraud claims, against four defendants: (1) Bedeschi Mid-West Conveyor Company, LLC ("Bedeschi"); (2) Dearborn Mid-West Conveyor Company, Inc.; (3) Larry Harp; and (4) Braxton Jones. Defendant Bedeschi responded to plaintiff's Complaint by asserting a Counterclaim, alleging breach of contract and breach of warranty claims and seeking a declaratory judgment that it never breached the parties' contract.

This matter comes before the court on the parties' cross-motions for summary judgment. Defendants have filed a Joint Motion for Partial Summary Judgment (Doc. 82). Defendants' motion asks the court to grant summary judgment against two of plaintiff's three claims: (1) Count II's claim for fraud, promissory fraud, and misrepresentation; and (2) Count III's claim for fraudulent suppression.

Plaintiff also has filed a Motion for Partial Summary Judgment (Doc. 84). Plaintiff's motion asks the court to grant summary judgment against: (1) Bedeschi's counterclaims for breach of contract and breach of warranty; (2) Bedeschi's declaratory judgment claim; and (3)

Bedeschi's affirmative defense asserting a setoff.  Also, plaintiff asks the court to enter summary judgment in its favor on plaintiff's assertion that Bedeschi changed the "scope of work," thus entitling plaintiff to additional payment under the parties' contract.

After considering the parties' arguments, the court grants defendants' summary judgment motion in part and denies in it part.  And the court denies plaintiff's summary judgment motion. The court explains why below.

## I.    Uncontroverted Facts

The following facts are either stipulated facts taken from the Pretrial Order (Doc. 79), or uncontroverted for purposes of the parties' summary judgment motions.

On July 9, 2014, Dearborn Mid-West Conveyor Company, Inc. ("Dearborn") entered into a contract with Essar Projects USA, LLC ("Essar").  Dearborn agreed to design, manufacture, and erect one or more "Iron Pellet" conveyor systems at iron and iron ore processing facilities owned or operated by Essar in Minnesota ("the Essar Project").  The contract provided that Dearborn could engage necessary or appropriate subcontractors to facilitate its performance under the contract, including one or more subcontractors responsible for manufacturing, fabricating, and delivering to Essar the parts, pieces, components, and materials used to construct the conveyor systems.

Dearborn then subcontracted its performance under the Essar Project contract to Bedeschi—a newly created company.  Bedeschi engages in the design, integration, and installation of material handling systems including "conveyor systems."  The principal consumers of conveyor systems are companies who:  generate electrical power; mine, extract, refine, or process minerals, cement, pulp and paper; or transport goods and commodities by sea.

Bedeschi does not manufacture conveyor systems. Instead, it engineers the desired equipment and subcontracts the manufacturing to outside steel fabricators.

Dearborn and Bedeschi entered into an asset purchase agreement. It provided that Dearborn would subcontract its obligations under its contract with Essar to Bedeschi. It also provided that Dearborn would remit to Bedeschi all amounts Essar paid Dearborn. Bedeschi never had a contract with Essar. Instead, as described, it served as Dearborn's subcontractor on the Essar Project.

### Bedeschi Contracts with NAFCO

After assuming its subcontractor obligations on the Essar Project, Bedeschi entered into written contracts with plaintiff North Alabama Fabricating Company, Inc. ("NAFCO") for NAFCO to manufacture fabricated steel equipment and support structures for use in the Essar Project's construction. The Blanket Subcontract Agreement (Doc. 83-4) and Subcontract Purchase Order and accompanying Terms and Conditions (Doc. 83-5) is the contract between Bedeschi and NAFCO for the Essar Project. The court refers to these documents collectively as "the Contract". The parties entered the agreements in September 2015.

Before it signed the Contract, NAFCO never requested Bedeschi's financial statements or any other information about Bedeschi, its business, assets, organization, or affiliations. In declarations submitted on summary judgment, Larry Harp (Bedeschi's President and CEO) and Braxton Jones (a Dearborn project manager) attest that when the parties entered the Contract in September 2015, neither Mr. Harp, Mr. Jones, nor Bedeschi intended not to fulfill Bedeschi's obligations under the Contract. Also, neither Mr. Harp, Mr. Jones, nor Bedeschi knew any facts that would or could prevent Bedeschi from performing its obligations under the Contract. Mr. Harp and Mr. Jones further attest that when the parties entered the Contract, Bedeschi intended

to pay NAFCO for its performance under the Contract in the amounts and at the times the Contract required.  Also, they knew no facts suggesting that Bedeschi would not or could not pay NAFCO as the Contract required.  Mr. Harp and Mr. Jones attest that, when the parties inserted the schedule for NAFCO's performance under the contract, Bedeschi intended to keep, follow, and adhere to the schedule.  Also, they knew no facts suggesting that Bedeschi would not keep the schedule or that it would need to disregard the schedule.  And Mr. Harp and Mr. Jones attest that, when the parties entered the Contract, Bedeschi intended to engage a shipper who would provide trucks to NAFCO for loading and transporting fabricated steel to the Essar Project jobsite.  Finally, Mr. Harp and Mr. Jones knew of no facts that would prevent Bedeschi from establishing a shipping method for the fabricated steel.

### The Terms of the Blanket Subcontract Agreement

The parties' Blanket Subcontract Agreement ("Subcontract") provided that Bedeschi would issue one or more purchase orders to NAFCO.  The purchase orders were deemed to include the terms and provisions of the Subcontract, to define the scope of NAFCO's work (including its start and completion dates), and to establish the compensation paid to NAFCO. The Subcontract required NAFCO to furnish all labor, management, supervision, engineering, materials, tools, equipment, construction utilities, supplies, samples, models, temporary structures, and facilities as well as hoisting, transportation, unloading, storage, hauling, and all other items necessary to perform the scope of work.

Article 4 of the Subcontract established the subcontract price.  It provided that each purchase order issued by Bedeschi to NAFCO would specify the full and complete compensation for performing the work described in the purchase order.  Article 4 also provided that Bedeschi is

not liable for any amount exceeding those amounts unless a written change order was issued under Article 17.

The Subcontract permitted Bedeschi to withhold all or part of any payment if Bedeschi deemed it necessary to enforce NAFCO's obligations or to protect Essar from loss. A withholding of payment could include a withholding resulting from NAFCO's performance of defective work under any purchase order.

The Subcontract required NAFCO to provide adequate protection, care, and maintenance for and to bear all risk of damage to, or loss of: all materials and equipment it furnished; all materials, supplies, and equipment it delivered to Bedeschi or Essar intended for incorporation or use in the performance of any work; and all work completed or in progress until the earlier of Bedeschi's written final acceptance or possession of the work by Bedeschi, Essar, or one of their other contractors. Also, the Subcontract required NAFCO to bear the expense of all overtime and additional labor necessary to meet the completion date established by any purchase order if caused by NAFCO's failure to perform according to the terms of the Subcontract.

The Subcontract provided that, in the event of a dispute between Bedeschi and NAFCO that also involved Essar in any way, the provisions of all contract documents, including the Bedeschi-Essar Project contract, were binding on NAFCO. Also, it required NAFCO to complete any portion or portions of any work within the time specified by the purchase order. And it required NAFCO to modify the order of performance as necessary to comply with Bedeschi or Essar's directives. NAFCO was entitled to extra compensation or an extension of time for completion, or both, only if it complied with the Subcontract's Article 17. Article 17(B) permitted NAFCO to seek changes to the agreement, including a price increase, but it required, among other things, that NAFCO submit the requested change in writing and Bedeschi approve

5

the change in writing.  But Article 17(A) permitted Bedeschi to make "minor changes" in the work (ones not involving a material increase in cost) with no adjustments made to the subcontract price.

Also, the Subcontract required that, upon receiving written notice from Bedeschi, NAFCO would suspend shipment and delivery of material and stop any part or all of the work or operations performed under the contract for any periods of time Bedeschi designated in the notice.  In such cases, NAFCO's reimbursement, if any, was limited to its actual costs and expenses without any overhead or anticipated profit for incomplete work.

The Subcontract provided Bedeschi the right, at any time, to terminate NAFCO's engagement under the Subcontract and any ensuing purchase orders by giving NAFCO written notice.  The written notice became effective 10 days after NAFCO received it.  After receiving written notice of termination, the Subcontract required NAFCO immediately to discontinue the work that Bedeschi had terminated and to stop placing orders for material, equipment, and supplies in connection with the work.  But it permitted NAFCO to perform work necessary to preserve and protect work already in progress or in transit and to protect material and equipment on the work premises or in transit thereto.  The Subcontract provided that neither Bedeschi nor Essar is liable for any damages or loss of anticipated profits because of such termination.  If Essar requested or directed the termination, the Subcontract prohibits NAFCO from recovering any costs, expenses, or other items resulting from the termination except to the extent that Bedeschi could recover the same from Essar for work that NAFCO performed.

Also, the Subcontract gave Bedeschi the right to terminate the agreement, or any portion thereof, and take possession of the finished and unfinished work by whatever method it deems expedient, upon 30-days' notice, in the event, among other things, that NAFCO:  failed to

prosecute any work with promptness or diligence; refused or failed to supply enough properly skilled workers or proper materials; refused or failed to make prompt payment for materials or labor on any project; or otherwise violated any of its agreements with Bedeschi.

NAFCO recognized that the work and materials that it produced under the Subcontract and any ensuing purchase order was of a special and unique nature, and it constituted a critical part of Bedeschi's own work for and on behalf of Essar.  Also, NAFCO recognized that Bedeschi would suffer irreparable harm and damages, including irreparable damage to its reputation and standing should NAFCO fail to make such work and materials available to Bedeschi, when needed.

The Subcontract provided that, in the event either NAFCO or Bedeschi failed to comply with any term, condition, requirement, or provision of the agreement or the purchase orders or otherwise defaulted upon any obligation contained in or imposed by the agreement or the purchases orders, the defaulting party would be liable for and must pay to the non-defaulting party all losses, damages, costs, and expenses of every kind and nature including reasonable attorney's fees incurred by the non-defaulting party in connection with the default.

Finally, the Subcontract provided, if NAFCO defaulted and the unpaid balance of the subcontract price is less than the amount by which the Subcontract permits reduction of the subcontract price, Bedeschi may deduct the difference from any sums payable to NAFCO.

### The Terms of the Subcontract Purchase Order

On October 5, 2016, NAFCO executed an acknowledgement copy of the Subcontract Purchase Order.  The Subcontract Purchase Order provided that $4,637,371 was the total price for NAFCO's performance.  The Subcontract Purchase Order required Bedeschi to pay the sum in serial payments equal to the agreed price for all materials and goods actually delivered within

the 30-day period next-preceding such payment, subject to a retention of 5%.  The Subcontract Purchase Order provided that Bedeschi would not consider charges for extra or additional equipment, material, or work without prior written authorization from Bedeschi's Project Manager.  Under the Subcontract Purchase Order, NAFCO expressly warranted that all goods or services covered by the agreement would be "of first class quality and . . . conform to the specifications, drawings, samples or descriptions furnished to or by" Bedeschi; that they would be "merchantable, of good material and free from defects, latent or patent;" and that since NAFCO knew of Bedeschi's "intended use" for such products, NAFCO "expressly warrant[ed] that all goods covered . . . [had] been selected, designed, manufactured, or assembled by" NAFCO "based on" Bedeschi's "stated use and" would "be fit and sufficient for the particular purposes intended by" Bedeschi.  Doc. 83-5 at 3.

The parties' Subcontract Purchase Order and attachments included several requirements governing NAFCO's work for the Essar Project.  One of the attachments is the Subcontract Purchase Order 's "Terms and Conditions."  Bedeschi drafted the "Terms and Conditions" using a form that it uses for other projects.  The Subcontract Purchase Order required that NAFCO's work generally would consist of all detailing, fabrication, and painting as outlined in the "General Instructions to" NAFCO as well as the "Level of Assembly" matrix.  The Subcontract Purchase Order required NAFCO to manufacture, construct, and fabricate "Crusher Concentrate Area Conveyors," "Pellet Plant Area Conveyors," and "Pellet Product Area Conveyors" as well as an inventory of spare parts.  *Id.* at 9–11.  The Subcontract Purchase Order's prices included: the unloading and storage of materials; preparation of shipping documents, efficient truck loading, dunnage, and strapping of material for shipping to the jobsite; and trucking arranged by NAFCO using Bedeschi's preferred carriers and third party billing.  The Subcontract Purchase

Order includes the term "FOB Origin."  This term means that, excluding warranty, NAFCO's responsibility for its goods ends when NAFCO loads the goods onto shipping trucks at NAFCO's facilities in Alabama.  Also, once NAFCO loads the goods onto the shipping trucks, title to the goods passes from NAFCO to Bedeschi.

Section 5 of the "Terms and Conditions" provides:

[Bedeschi] reserves the right at any time to direct changes, or cause [NAFCO] to make changes to drawings and specifications of the goods or to otherwise change the scope of the work covered by this [purchase] order, including work with respect to such matters as inspection, testing or quality control, and [NAFCO] agrees to promptly make such changes; any difference in price or time of performance resulting from such changes shall be equitably adjusted by [Bedeschi] after receipt of documentation in such form and detail as [Bedeschi] may direct.  Any changes to this order shall be made in accordance with Paragraph 27.

*Id.* at 2.  Section 27 provides:  "This Order may only be modified by a purchase order amendment/alteration issued by [Bedeschi]."  *Id.* at 5.

Section 22 of the "Terms and Conditions" provides:

<u>Setoff</u>
In addition to any right of set-off provided by law, all amounts due [NAFCO] shall be considered net of indebtedness of [NAFCO] to [Bedeschi] and its subsidiaries; and [Bedeschi] may deduct any amounts due from [NAFCO] to [Bedeschi] and its subsidiaries from any sums due or to become due from [Bedeschi] or its subsidiaries to [NAFCO].

*Id.* at 4.

The Subcontract Purchase Order also contains an attached "Table of Contents" listing additional provisions incorporated into the parties' Contract.  Section 5 incorporates the "Specifications and Codes" of several outside authorities, including those of the American Institute of Steel Construction ("AISC").  *Id.* at 9.  The AISC's Code of Standard Practice for Steel Buildings and Bridges ("AISC Code") is a publication setting forth the industry "trade

practices . . . involved in the design, purchase, fabrication and erection of structural steel." Doc. 85-5 at 4.

Section 1.1 of the AISC Code provides:  "In the absence of specific instructions to the contrary in the *contract documents*, the trade practices that are defined in this code shall govern the fabrication and erection of structural steel." *Id.* at 14.   The Commentary Section 1.1 of the AISC Code states:  "This code is not intended to . . . change the duties and responsibilities of the *owner*, contractor, *architect or general engineer of record* from those set forth in the *contract documents*; nor assign to the *owner, architect or general engineer of record* any duty or authority to undertake responsibility inconsistent with the provisions of the *contract documents*." *Id.*

Section 9.4.1 of the AISC Code provides:

When the scope of work and responsibilities of the fabricator and the erector are changed from those previously established in the contract documents, an appropriate modification of the contract price shall be made.  In computing the contract price adjustment, the fabricator and the erector shall consider the quantity of work that is added or deleted, the modifications in the character of the work and the timeliness of the change with respect to the status of material ordering, detailing, fabrication and erection operations.

*Id.* at 76. Section 9.4.3 of the AISC Code states:

Price-per-pound and price-per-item contracts shall provide for additions or deletions to the quantity of work that are made prior to the time the work is *released for construction*.  When changes are made to the character of the work at any time, or when additions and/or deletions are made to the quantity of the work after it is released for detailing, fabrication or erection, the contract price shall be equitably adjusted.

*Id.*

### *Performance of the Contract*

In November and December 2015, NAFCO delivered eight shipments of fabricated steel to the Essar Project, as the parties' Contract required.  Bedeschi paid NAFCO in full for those deliveries less retainage, after it received payment itself.

In the fall of 2015, construction on the Essar Project stopped because the project owner was unable to secure additional funding needed to finish construction and commence production. Then, in December 2015, Essar failed to provide proof of an extension of a Letter of Credit as a method of payment for invoices submitted for work on the Essar Project.

On December 22, 2015, Bedeschi sent a letter to NAFCO. It stated that Bedeschi had given Notice of Default to the Essar Project owner on account of its failure to provide and maintain letters of credit as a method for payment of invoices submitted for work performed on the Essar Project. The letter invoked the parties' Contract, specifically Section 3 of the Terms and Conditions of the Subcontract Purchase Order. And it instructed NAFCO to suspend all further shipments to the Essar Project while Bedeschi continued to pursue issuance of compliant letters of credit or other credit facilities from Essar that would assure payment and permit NAFCO to resume shipment. Bedeschi's temporary suspension applied to shipments of material then in the process of fabrication as well as all future shipments.

On December 23, 2015, NAFCO sent a letter to Bedeschi. It reported that NAFCO would suspend further operations and shipments and await reinstatement of the suspended work. NAFCO then sent invoices to Bedeschi for the additional costs NAFCO had incurred because of the work's suspension, as provided by Article 24 of the Bedeschi-NAFCO Subcontract. Bedeschi never paid those invoices.

In an email dated March 28, 2016 and sent to NAFCO, Mr. Jones (a Dearborn Project Manager) told NAFCO that it should include a line item in its invoice for interest—or the cost of money—because Bedeschi needed to show the separate charge when it presented a request for a change order to Essar. Mr. Jones noted that Mr. Harp (Bedeschi's President and CEO) had suggested during an earlier conference call that NAFCO include this line item. On March 31,

2016, NAFCO responded to Mr. Jones's email by providing an updated change order request that included the "cost of money" at $6,750 per month for the four months while Bedeschi had suspended NAFCO's work.  Doc. 97-17 at 1.  Bedeschi never responded to NAFCO's March 31 email.  It also never contested the "cost of money" line item.

On May 2, 2016, Bedeschi and NAFCO representatives met to discuss the possibility of Bedeschi lifting the temporary suspension.  Mr. Harp suggested to NAFCO that the best way for it to get paid for materials NAFCO had constructed was to ship them to the Essar Project.  The parties agreed that, if Bedeschi agreed to lift the suspension, the payment terms established in the Contract would continue to control.  But John Ralph Parrish (NAFCO's President) testified that Bedeschi offered to pay NAFCO interest if NAFCO resumed its shipments.  During the meeting, Bedeschi never asked NAFCO to change the terms of the parties' Contract.  To the contrary, the parties agreed that Bedeschi would be obligated to satisfy all outstanding invoices.  But Bedeschi also told NAFCO that it would make payment to NAFCO when Bedeschi itself was paid for its work on the Essar Project.

At the May 2 meeting, NAFCO asked Bedeschi to provide it with a letter of credit to ensure payment.  Bedeschi refused.  Also at the May 2 meeting, NAFCO asked Bedeschi to enter into a written change order reflecting that it would pay NAFCO additional amounts that NAFCO claimed it was owed for its performance under the Contract.  Bedeschi refused to enter or issue any such change order.

Later in May, Mr. Harp spoke with Jim Smothers (a NAFCO employee) about NAFCO's work on the Essar Project.  Mr. Harp told Mr. Smothers that Bedeschi would pay NAFCO when Bedeschi itself received payment for the Essar Project.  Also, Mr. Harp told Mr. Smothers that, if NAFCO resumed shipping fabricated steel to the Essar Project, Bedeschi would pay NAFCO

when Bedeschi was paid.  Also during May 2016, Mr. Jones told NAFCO that Bedeschi needed

Essar to pay invoices so that it could pay NAFCO for its work on the Essar Project.  Mr. Jones

told NAFCO that Bedeschi did not have the ability to pay NAFCO until Essar made its

payments.  When Mr. Jones made these representations, he believes he relied on information that

he received from either Mr. Harp or Bedeschi's Controller, Nancy Burris, about the company's

finances.

On May 4, 2016, Bedeschi sent a letter to NAFCO lifting the temporary suspension and

directing NAFCO to resume shipments immediately.  The letter asked NAFCO to ship the

material as quickly as possible so that Bedeschi could be paid under a letter of credit that

required delivery of the materials on or before June 10, 2016.  More specifically, the accelerated

shipment date required NAFCO to paint and ship 300 tons of fabricated steel within four to five

weeks.  Bedeschi acknowledges that this order involved a lot of steel and amounted to "a tall

order."  Doc. 85-3 at 133 (Jones Dep. 389:6–12).  The letter also explained that Bedeschi would

pay NAFCO once it had received a corresponding payment for the materials from Essar.

After it received the May 4 letter, NAFCO informed Bedeschi that, given the accelerated

shipment date, it believed Bedeschi would be responsible for NAFCO's increased costs arising

from the earlier suspension and future accelerated schedule.  Mr. Harp and Mr. Jones represented

to NAFCO's President that Bedeschi would compensate NAFCO for those expenses.  Mr. Jones,

testifying in his capacity as Bedeschi's designated corporate representative, testified that before

resuming the shipments in May 2016, "Bedeschi knew it was going to have to pay NAFCO

amounts that weren't provided for in the parties' contract."  Doc. 85-3 at 113 (Jones Dep. 323:2–

6).  Also, Mr. Jones testified that Bedeschi's suspension of shipments in December 2015, and its

resumption of shipments on an expedited basis in May 2016, constituted a significant change to

NAFCO's work under the Contract.  Still, NAFCO and Bedeschi never changed the payment terms as established by the Subcontract Purchase Order and Terms and Conditions.

On May 10, 2016, Mr. Jones told NAFCO that Bedeschi would pay NAFCO when Essar paid Bedeschi.  On May 11, 2016, Mr. Jones sent an email to NAFCO that again explained that Bedeschi would pay NAFCO when it received the corresponding payment from Essar.

Between May and July 2016, NAFCO delivered 34 more loads of fabricated steel totaling more than $1.3 million in product.  Bedeschi assured NAFCO that the letter of credit provided the necessary surety to allow Bedeschi to compensate NAFCO for its work.  In response, NAFCO repeatedly told Bedeschi that its payment obligations to NAFCO were independent of any compensation it might receive under the letter of credit.  NAFCO repeatedly has declined any attempts to amend or alter the parties' Contract.  Instead, it has reserved its rights under that agreement.

### Bedeschi Receives Payment from Essar

Essar eventually paid Dearborn more than $16 million for the Essar Project.  Dearborn has paid Bedeschi all amounts it has received from Essar.  Bedeschi received the balance of the payment after NAFCO filed this lawsuit.  Bedeschi never informed NAFCO that Essar had paid Dearborn the $16 million.  Mr. Jones testified that the payment had occurred just recently—after this lawsuit was filed.  Mr. Jones acknowledged that Bedeschi had informed NAFCO several times that Essar had made no payments to Dearborn.  But Mr. Jones testified that these statements were accurate when Bedeschi made them because Essar had not yet paid Dearborn.

Bedeschi now has received payment (from Essar through Dearborn) for 39 of the 42 loads of steel that NAFCO delivered to the Essar Project.  Bedeschi has not paid NAFCO's invoices because the parties have not agreed on the amount that Bedeschi owes NAFCO.

Bedeschi has told NAFCO several times that Bedeschi could not pay its invoices because NAFCO had not provided sufficient documentation to support them. Mr. Jones described the invoices as "not yet valid" because they lack proper documentation. Doc. 97-2 at 48–49 (Jones Dep. 260:20–261:8). And for this reason, Bedeschi has not paid the invoices. Bedeschi acknowledges, though, that its suspension and resumption of shipments probably caused NAFCO to incur increases in the cost of work, costs stemming from inefficiencies, and loss of productivity. But Bedeschi has not received information showing that NAFCO experienced these increases from the suspension and resumption of shipments.

On October 4, 2017, Bedeschi paid NAFCO $944,378.30. Bedeschi believed it owed NAFCO this amount for the final 34 shipments of product under the Contract, plus a portion of the additional charges that NAFCO had claimed. Bedeschi also provided a reconciliation showing the method Bedeschi had used to calculate the payment amount. This payment was the first one that Bedeschi made for the 34 shipments that NAFCO had delivered between May and July 2016.

### Bedeschi's Estimates of Costs for the Essar Project

After Bedeschi suspended NAFCO's work in December 2015, but before it resumed NAFCO's shipments to Essar in May 2016, Mr. Jones prepared a document titled "Essar Vendor Recap." Mr. Jones prepared the Essar Vendor Recap document to estimate Bedeschi's potential exposure to its vendors, including NAFCO, on the Essar project. As of February 22, 2016 (when Mr. Jones sent the Essar Vendor Recap in an email), Bedeschi estimated that it owed NAFCO $1,297,425.40. Mr. Jones reached this estimate using the information that he had at the time. And he based the estimate on Essar potentially cancelling the project. So the estimate included

costs NAFCO had incurred as of February 22, 2016, but not additional costs NAFCO would incur if Bedeschi resumed shipments.

Mr. Jones also drafted a document titled "NAFCO Estimate Summary." He prepared this document to estimate NAFCO's "hard costs" for the Essar project. Doc. 85-3 at 143 (Jones Dep. 410:20–24). The NAFCO Estimate Summary reflects Bedeschi's estimation of NAFCO's cost of materials based on average cost per pound, buyouts and additional engineering changes, storage, and unabsorbed detailing. The NAFCO Estimate Summary does not include NAFCO's costs for painting the steel.

The NAFCO Estimate Summary document bears a date of August 2, 2016—showing that it was printed on that date, not created. Mr. Jones guesses that he created the document before August 2, 2016, but not long before that date. He also believes that he created the document after June 10, 2016, when NAFCO completed shipments to the project.

The NAFCO Estimate Summary document includes a "Current Estimate" of its liability to NAFCO of $1,388,815.22 and an "Upper Bound" estimate of $1,712,815.22. Mr. Jones created this document before Bedeschi paid NAFCO $944,378.30—the amount Bedeschi believed it owed NAFCO for the final loads, plus extras.

### *Warranty Issues*

Mr. Harp, Mr. Jones, and Skip Moore (the head of Bedeschi's quality and safety department) testified that NAFCO produces quality goods. But Mr. Jones testified that Bedeschi believes that NAFCO defaulted on its Contract obligations in three distinct ways: (1) NAFCO failed to submit sufficient back up documentation with its invoices; (2) NAFCO loaded its goods onto Bedeschi's shipping trucks unsafely, and (3) the paint on NAFCO's goods are not sufficiently thick.

Mr. Harp and Mr. Jones testified that Bedeschi never provided any notice to NAFCO that the goods it had delivered to Essar were non-conforming. But Mr. Harp testified that he recently had learned—maybe a couple of weeks before the deposition—about concerns with the goods' paint thickness. Also, Mr. Harp testified that Bedeschi would not discover any other potential concerns about the goods' conformity until the goods were erected at the jobsite. Mr. Harp testified that Bedeschi's concerns about paint thickness arose after it reviewed documents that NAFCO had provided to it on May 2, 2017.

When Mr. Harp was deposed in this case, no one from Bedeschi had investigated yet the concerns about paint thickness. But, after Mr. Harp and Mr. Jones's depositions—on August 23, 2017—Bedeschi delivered to NAFCO an Inspection Report that describes how NAFCO's goods are non-conforming. Specifically, the Inspection Report asserts that, on August 10, 2017, Bedeschi inspected the goods at the Essar Project jobsite. And it asserts that the inspection revealed that the paint thickness was inadequate and did not conform to the parties' Contract. Bedeschi's concern about paint thickness is one of the reasons that it has withheld payment from NAFCO. NAFCO never has repainted the fabricated steel or otherwise cured the purported paint defects.

NAFCO denies that the paint on the fabricated steel that it delivered to the Essar Project jobsite fails to conform with the Contract's specifications. Also, NAFCO denies that the paint on its goods is defective. NAFCO's President, John Ralph Parrish, questions the Inspection Report's validity because NAFCO delivered more than 4,000 pieces to the jobsite but the Report recorded observations about 19 pieces only. Also, after reviewing photographs attached to the Report, Mr. Parrish questioned whether other issues such as shipping damage or dirt marks account for the "rusted conditions" identified by the Report.

17

Before the August 10, 2017 inspection, Bedeschi never had inspected the goods NAFCO had supplied to the Essar Project jobsite. Also, this inspection was the first time that Bedeschi had inspected the final 34 loads that NAFCO delivered between May and July 2016. Mr. Jones testified that Essar never prevented Bedeschi from inspecting the goods at the Essar Project jobsite. Bedeschi never performed earlier inspections because it did not have time to do so. After July 8, 2016, Bedeschi could not access the Essar Project jobsite because Essar filed for bankruptcy on that date. But, after August 3, 2017, Bedeschi secured permission to enter the jobsite to inspect NAFCO's fabricated steel.

In November and December 2015, Bedeschi performed two inspections of NAFCO's facilities during the fabrication process. Bedeschi observed a limited number of nonconformities. And it gave notice to NAFCO of the non-conforming work. NAFCO remedied that work after receiving Bedeschi's notice.

After NAFCO filed this lawsuit, Bedeschi complained to NAFCO that it had delivered unassembled goods to the Essar Project.[1] Bedeschi never made such complaints before the lawsuit's filing. And Bedeschi never had returned any goods back to NAFCO because they were unassembled.

Bedeschi does not know whose job it is to assemble the goods that NAFCO supplies. But Mr. Jones testified that NAFCO had an obligation to assemble component parts together. Bedeschi does not know if Essar has hired someone to assemble the goods or whether someone ever will assemble the goods. When NAFCO manufactured and delivered the first eight shipments, Bedeschi had not provided NAFCO with all the components required to assemble the

---

[1] The term "assembling" goods means to put the various individual components together into a complete conveyor system.

goods because the components were not yet manufactured.  And to date, Bedeschi has not provided to NAFCO all of the equipment necessary for NAFCO to assemble the goods.

After Bedeschi directed NAFCO to resume shipments in May 2016, Bedeschi told NAFCO to assemble the goods "to the extent possible."  Doc. 85-18 at 5.  Mr. Jones explained that Bedeschi's request to assemble the goods "to the extent possible" meant that NAFCO did not have all the components required for full assembly but that Bedeschi was directing NAFCO to assemble the goods to the extent possible with the components that NAFCO did have.  Later, NAFCO advised Bedeschi that it could not assemble the goods in the accelerated time frame and that it lacked the materials to do so.  With this information from NAFCO, Bedeschi accepted and understood that NAFCO would not assemble the goods shipped after NAFCO resumed shipments in May 2016.  Nevertheless, Bedeschi still believed that NAFCO had an obligation to assemble the goods.  Mr. Jones suggested that NAFCO could make arrangements for NAFCO—itself—to assemble the goods in the field, or it could adjust its price with Bedeschi to have Bedeschi assemble the goods, or it could pay the customer or another subcontractor to perform the assembly.  Bedeschi believes that the Contract allows it to deduct assembly charges from what it owes to NAFCO for goods that it delivered unassembled.

Mr. Jones testified that he had no direct knowledge of how NAFCO's goods are stored at the Essar Project jobsite.  But he acknowledged that, according to the Purchase Order, the goods supplied by NAFCO are intended for outdoor exposure to the elements.  Bedeschi's Counterclaim asserts that NAFCO's goods "have been reduced to scrap value."  Doc. 41 at 16–17 (Counterclaim ¶ 17(d)).  But Mr. Jones testified—as Bedeschi's designated corporate representative—that Bedeschi does not know whether that assertion is true because it has not visited the jobsite.

### *NAFCO's Fraud Assertions*

Bedeschi has denied responsibility for the increased costs NAFCO incurred from complying with Bedeschi's demands for accelerated shipments.  NAFCO asserts that Bedeschi, Mr. Harp, and Mr. Jones misrepresented certain material facts to NAFCO.  They include (but are not limited to) the following:

- Bedeschi would pay timely all invoices submitted by NAFCO;

- Bedeschi would lift the temporary suspension, pay NAFCO's past-due invoices, and pay all invoices associated with future shipments;

- Bedeschi would pay NAFCO all increased costs and expenses arising from Bedeschi's accelerated shipment schedule;

- Bedeschi would not seek to alter the terms of the parties' Contract, including its payment terms;

- NAFCO's past-due invoices were properly payable; and

- Bedeschi was agreeable to the cost basis and amounts of NAFCO's past and future invoices.

Also, NAFCO asserts that Bedeschi, Mr. Harp, and Mr. Jones fraudulently suppressed certain material facts from NAFCO.  They include (but are not limited to) the following:

- Bedeschi had no intention of abiding by the terms of parties' Contract;

- Bedeschi had no intention to pay NAFCO under the terms of the Subcontract Purchase Order and Terms and Conditions;

- Bedeschi was not willing or capable of complying with the parties' contracts;

- Bedeschi did not intend to compensate NAFCO for the additional costs associated with the temporary suspension;

- Bedeschi did not intend to compensate NAFCO for the additional costs associated with the accelerated shipment schedule; and

- After entering into the parties' Contract, Bedeschi would seek to alter its terms after NAFCO had complied with its own obligations.

On September 12 and 13, 2017, NAFCO's President, John Ralph Parrish, testified by deposition both individually and as NAFCO's corporate representative under Federal Rule of Civil Procedure 30(b)(6). In response to a question asking him to identify every way that defendants misrepresented something to NAFCO, Mr. Parrish testified that defendants misrepresented who NAFCO actually was working for—either Bedeschi or Dearborn. But Mr. Parrish conceded that, when NAFCO later signed the Contract, the Contract was with Bedeschi—not Dearborn. Mr. Parrish also could not remember specifically if NAFCO ever asked to review Bedeschi's financial documents before signing the contracts.

Mr. Parrish testified that Bedeschi also misrepresented to NAFCO that it would pay for NAFCO's completed work after it issued a stop work order. When asked why that was a misrepresentation, Mr. Parrish responded that the Contract required the payment but Bedeschi never intended to comply with the Contract's obligations. Mr. Parrish testified that he knew Bedeschi never intended to honor the Contract because it never made required payments. But Mr. Parrish conceded that he did not know what Mr. Harp or Mr. Jones intended when the parties signed the Contract. Mr. Parrish only knows what they intended based on their actions. And Mr. Parrish testified that Mr. Harp and Mr. Jones never told him—in September 2015, when the parties entered the Contract—that Bedeschi never intended to pay NAFCO under the Subcontract.

Also, Mr. Parrish testified that Bedeschi misrepresented to NAFCO the proposed schedule for fabricating and delivering steel. Mr. Parrish asserted that Bedeschi did not fulfill the schedule and apparently never intended to fulfill it. Mr. Parrish testified that the schedule—maybe the same, maybe a little different—was incorporated in the Subcontract that the parties entered in September 2015. Mr. Parrish explained that an email from Mike Ostradick to Mr. Jones showed that Bedeschi could not fulfill its Contract obligations, but it never notified NAFCO of that information. Mr. Parrish conceded that the email was dated sometime in July 2015, before the parties entered the Bedeschi-NAFCO Subcontract. The email—dated July 16, 2015—is from Mike Ostradick to Braxton Jones and has as its subject: "ESSAR-Lassing and IFC drawings." Doc. 83-7. The email states:

> Braxton,
>
> I learned that Lassing has stopped work on incorporating comments on design drawings as well as releasing IFC drawings. Is this correct? If so, what do we expect NAFCO to work on?
>
> Mike

*Id.* When asked how the alleged misrepresentation "about the schedule resulted in damage to NAFCO," Mr. Parrish testified:

> Well, I believe that single misrepresentation from Mr. Ostradick, who is an employee of Dearborn/Bedeschi, signifies that they knew they weren't going to meet the schedule; and therefore, they had fraudulent intent at that time and never conveyed that to us. And then throughout the project, they missed their dates. And by missing those dates, they continually added costs and overhead to us and we continued to work in good faith that we would supply a product, meet a schedule, and be paid for that in return.

Doc. 83-6 at 7 (Parrish Dep. 25:19–26:12).

The next misrepresentation that Mr. Parrish identified was that Bedeschi, Mr. Harp, or Mr. Jones misrepresented that Bedeschi could provide shipping to NAFCO for the project, but

Bedeschi never adequately fulfilled that obligation.  Mr. Parrish acknowledged that the Bedeschi-NAFCO Subcontract required Bedeschi to provide shipping for the fabricated steel from Alabama to the Essar Project in Minnesota.  Mr. Parrish believes that Bedeschi, Mr. Harp, and Mr. Jones knew when they signed the Subcontract that they could not provide trailers for NAFCO to use to load and ship fabricated steel.  Mr. Parrish's reason for believing this is that Bedeschi did not have the trailers set up for loading and transport.  So, according to Mr. Parrish, Bedeschi did not manage its job to allow NAFCO to fulfill its Contract obligations.  Mr. Parrish's reason for believing that Bedeschi never intended to provide shipping is based on Bedeschi's inaction, *i.e.* its failure to set up the shipping method.  Mr. Parrish testified that Bedeschi's actions prove that Bedeschi never intended to comply with its shipping obligations.

Mr. Parrish testified about a May 2, 2016 meeting between Bedeschi and NAFCO representatives.  Mr. Parrish conceded that Bedeschi told NAFCO in this meeting that Bedeschi would pay NAFCO when Bedeschi itself was paid by its customer—Essar.  But Mr. Parrish also recognized that the parties' Contract required Bedeschi to pay NAFCO according to the Contract's terms.  Mr. Parrish testified that, after learning that Bedeschi would pay NAFCO when Bedeschi was paid, NAFCO nevertheless shipped more loads (Loads 9 through 42) to the Essar Project in May and June 2016.

Mr. Parrish testified that NAFCO knew nothing about Bedeschi's line of credit until April 2016.  Mr. Parrish conceded that no signed writing exists in which Bedeschi assumed responsibility for NAFCO's increased costs arising from suspending the contract performance and then later accelerating the schedule for contract performance.  But Mr. Parrish testified that Mr. Harp agreed to some of the additional costs before the May 2 meeting.  Mr. Parrish also

testified that NAFCO made an offer in writing to meet Bedeschi's accelerated schedule, and Mr. Harp acknowledged the document.

Before the May 2 meeting, Mr. Harp had discussions with Jim Smothers (another NAFCO employee) about NAFCO shipping product to the Essar Project so that Bedeschi could get paid. Mr. Parrish heard two of these conversations in Mr. Smothers's office. Mr. Parrish testified that Mr. Harp wanted Mr. Smothers to induce Mr. Parrish to ship the product to the Essar Project jobsite. Mr. Parrish testified that the first conversation occurred in the April timeframe leading up to the May 2 meeting. Mr. Parrish described the conversation as "sort of twofold. It was regarding getting payments and then it was regarding [Bedeschi's] plan to try to initiate and be able to try to ship everything. I assume they were—they were working with counsel at that time, yourself or whomever, trying to figure out how to work through this situation." Doc. 83-6 at 14 (Parrish Dep. 59:7–17). Mr. Parrish testified that this conversation was false and misleading because Bedeschi never intended to pay NAFCO. And he testified that he knew what Mr. Harp intended based on the fact that Bedeschi never made payment.

Mr. Parrish testified that Bedeschi committed overt fraud when Mr. Harp and Mr. Jones promised to pay NAFCO interest and additional costs as a means to induce NAFCO to ship the product. After NAFCO shipped the product—and Mr. Parrish assumes that counsel got involved—Bedeschi changed what it was willing to pay NAFCO. Mr. Parrish conceded that he was not inside the mind of Mr. Harp or Mr. Jones. But he testified that Mr. Harp and Mr. Jones committed fraud based on what he observed—that they induced NAFCO to ship with promises to pay and then changed their positions after NAFCO had shipped the product.

Mr. Parrish conceded that, during the May 2 meeting between NAFCO and Bedeschi,

NAFCO asked Bedeschi for a letter of credit but did not receive one.  Also during the May 2 meeting, NAFCO asked for a change order reflecting the extra amounts that NAFCO claimed it was due.  But NAFCO never received such a change order.

When asked to identify what alleged misrepresentation Mr. Harp and Mr. Jones failed to correct when they later learned that those representations were false, Mr. Parrish testified that they never corrected the schedule issues when they knew they were not going to meet them. Also, Mr. Parrish testified that Mr. Harp and Mr. Jones never corrected the drawing issues— meaning that the drawings were not correct.  Mr. Parrish asserted that Bedeschi kept revising the drawings, that Bedeschi kept missing their dates, and that neither Mr. Harp nor Mr. Jones ever gave NAFCO updated schedules of when they would complete them.  Also, Mr. Parrish testified that Mr. Harp and Mr. Jones represented to NAFCO "that they would pay us, if not anything, when they got paid, whether we agreed with it."  Doc. 83-6 at 19 (Parrish Dep. 96:13–21).  Mr. Parrish believes that these actions were fraudulent because, if Bedeschi truly was trying to work with NAFCO, Bedeschi would have told NAFCO what was "going on" but it never did.  *Id.* at 20 (Parrish Dep. 97:21–98:5).

### *NAFCO's Damages Claim*

As part of its damages claim, NAFCO seeks damages for lost profits of $900,000.  Doc. 79 at 19 (Pretrial Order ¶ 5(i)).  NAFCO also seeks lost business opportunities damages in the amount of $2.5 million.  *Id.* (Pretrial Order ¶ 5(ii)).  When asked about NAFCO's lost business opportunities, NAFCO President John Parrish testified that he could not remember them "off the cuff" but that NAFCO bids on "a tremendous amount of projects weekly."  Doc. 83-6 at 17 (Parrish Dep. 85:18–86:5).  Mr. Parrish testified that NAFCO had missed several business opportunities, but was able to identify only one by name—the Dominion project.  Mr. Parrish

could not recall the amount of NAFCO's lost profits on the Dominion project.  Also, Mr. Parrish could not provide a number for the dollar value of damages for lost business opportunities.

Also, NAFCO seeks damages for the entire contract price—in the amount of $4,637,371.  Doc. 79 at 19 (Pretrial Order ¶ 5(i)).  Mr. Parrish conceded that NAFCO has not performed its obligations under the Contract fully because it has performed only to the extent Bedeschi and Dearborn allowed NAFCO to perform.  Mr. Parrish does not know the percentage of the Contract that NAFCO has performed.  Mr. Parrish conceded that for the portion of the contract NAFCO has not performed, NAFCO has avoided certain costs.  These avoided costs include labor, variable overhead, materials, and employee fringe benefits.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law."  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citing *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving

party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Id.* (citing *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof." *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 670 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

The court applies this same standard to cross motions for summary judgment. Each party bears the burden of establishing that no genuine issue of material fact exists and that it is entitled, as a matter of law, to the judgment sought by its motion. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). Cross motions for summary judgment "are to be treated separately; the denial of one does not require the grant of another." *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979). But where the cross motions overlap, the court may address the legal arguments together. *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010) (citation omitted).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

### III.    Analysis

The court begins its analysis by considering defendants' Joint Motion for Partial Summary Judgment.  Doc. 82.  The court then addresses plaintiff NAFCO's Motion for Partial Summary Judgment.  Doc. 84.

### A.  Defendants' Motion for Partial Summary Judgment

Defendants' motion seeks summary judgment against NAFCO's fraud and fraudulent suppression claims.  Also, the motion seeks summary judgment against NAFCO's damages claims for lost profits, lost business opportunities, and the entire contract price.  The court addresses each of defendants' arguments in the following subsections.

### 1.  Fraud and Fraudulent Suppression Claims

The parties' summary judgment papers discussing NAFCO's fraud and fraudulent suppression claims read like two ships passing in the night.  Defendants assert that no reasonable jury can conclude from the undisputed summary judgment facts that defendants are liable to NAFCO on its fraud, fraud in the inducement, promissory fraud, or fraudulent suppression claims.  Defendants base their summary judgment motion entirely on the Rule 30(b)(6) deposition testimony of NAFCO's President, John Parrish.  Defendants assert that Mr. Parrish was asked in his deposition to identify each way that defendants misrepresented something to NAFCO.  In response to this question, Mr. Parrish identified five misrepresentations or fraudulent omissions.  And, defendants contend, the summary judgment facts present no triable issue about any of the five misrepresentations or omissions.  So, defendants ask the court to enter summary judgment against NAFCO's fraud and fraudulent suppression claims.

The five alleged misrepresentations or fraudulent omissions that defendants identify— based on Mr. Parrish's Rule 30(b)(6) testimony—are:  (1) defendants never identified who

NAFCO was working with under the Contract, *i.e.*, whether it was Bedeschi or Dearborn; (2) defendants represented that they would pay NAFCO for the work it completed before Bedeschi directed it to stop work in December 2015; (3) defendants represented, when the parties signed the Contract in 2015, that Bedeschi would pay NAFCO for its work under the Contract; (4) defendants misrepresented that it would adhere to the Contract's schedule and would provide a shipping method for the goods; and (5) defendants induced NAFCO to resume shipments of the fabricated steel in May 2016, by representing that Bedeschi would pay NAFCO.

NAFCO's Opposition never addresses these five alleged misrepresentations. Instead, NAFCO asserts that it has alleged other misrepresentations in the Pretrial Order that defendants' summary judgment motion never addresses. Thus, NAFCO contends, defendants are not entitled to summary judgment against NAFCO's fraud and fraudulent suppression claims in their entirety.

Because NAFCO never addresses the five misrepresentations and fraudulent omissions that are addressed by defendants' summary judgment motion, the court properly may assume that NAFCO has abandoned any fraud or fraudulent suppression claims premised on these five misrepresentations or omissions. *See Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768–69 (10th Cir. 2001) (affirming district court's dismissal of plaintiff's equal protection claim after it concluded that plaintiff had abandoned the claim because he had not addressed it in his memorandum opposing summary judgment); *see also C.T. v. Liberal Sch. Dist.*, 562 F. Supp. 2d 1324, 1337 (D. Kan. 2008) (concluding that plaintiff had abandoned his retaliation claim by not responding to defendant's motion for summary judgment against the claim). Thus, the court grants summary judgment, in part, against NAFCO's fraud and fraudulent suppression claims to the extent that they are based on any of the five alleged misrepresentations or omissions

identified in Mr. Parrish's Rule 30(b)(6) deposition testimony.  But the court agrees with NAFCO that this ruling does not dispose of its fraud and fraudulent suppression claims in their entirety because NAFCO has alleged other misrepresentations and omissions to support the claims.

Indeed, NAFCO asserts in the Pretrial Order that "Defendants misrepresented, *among other things*, that they would pay NAFCO for NAFCO's increased costs arising from Defendants' suspension and resumption of shipments to the [Essar] Project" and "that Dearborn and Bedeschi had not been paid by Essar for NAFCO's goods."  Doc. 79 at 13 (Pretrial Order ¶ 4.a.2.) (emphasis added).  Also, NAFCO asserts in the Pretrial Order:  "*Among other things*, Defendants suppressed that they had been paid by Essar for NAFCO's work on the [Essar] Project" and "that Bedeschi had been paid $16,000,000 by Essar."  *Id.* (Pretrial Order ¶ 4.a.3.) (emphasis added).

NAFCO's Opposition lists four types of fraudulent conduct that, it contends, support its fraud and fraudulent suppression claims:

> (a) Defendants' misrepresentations that Bedeschi would pay NAFCO's invoices when Essar paid Bedeschi.
>
> (b) Defendants' misrepresentations that Bedeschi had not been paid by Essar, along with Defendants' failure to correct these misrepresentations.
>
> (c) Defendants' misrepresentations that Bedeschi would pay NAFCO interest, or the "cost of money," along with their subsequent refusal to do so.
>
> (d) Defendants' suppression that Dearborn and Bedeschi had, in fact, been paid by Essar, along with Defendants' failure to correct their prior misrepresentations.

Doc. 97 at 57–58.  Because defendants never moved for summary judgment against NAFCO's fraud and fraudulent suppression claims premised on these allegations,[2] the court agrees with NAFCO.  Those fraud claims survive summary judgment.

Defendants' Reply asserts two more arguments.  *First*, defendants try to limit NAFCO's fraud and fraudulent suppression claims to the five alleged misrepresentations and omissions that Mr. Parrish testified about in his Rule 30(b)(6) deposition.  *See* Doc. 101 at 79 (listing what defendants contend is the "only evidence [NAFCO] has of Bedeschi's intent <u>not</u> to fulfill its obligations to NAFCO under the contract" as those provided "[b]y NAFCO's own admissions in the form of Rule 30(b)(6) testimony of its CEO, Ralph Parrish"); *see also id.* at 85 (describing Mr. Parrish's Rule 30(b)(6) testimony as "the <u>universe</u> of [NAFCO's] proof regarding fraudulent suppression 'misrepresentations'").  But defendants cite no case law to support their argument that Mr. Parrish's testimony limits NAFCO's fraud claims to those based on the misrepresentations and omissions to which NAFCO's Rule 30(b)(6) witness testified.

To the contrary, the Tenth Circuit recently has held that "the testimony of a Rule 30(b)(6) witness is merely an evidentiary admission, rather than a judicial admission." *Vehicle Mkt. Research, Inc. v. Mitchell Int'l, Inc.*, 839 F.3d 1251, 1261 (10th Cir. 2016).  In that case, the appellant argued that the trial court erred by refusing to give the jury the following instruction: "The corporation cannot present a theory of the facts that differs from that articulated by the designated Rule 30(b)(6) representative." *Id.* at 1256.  The Tenth Circuit disagreed, concluding that the trial court correctly deleted this sentence from a jury instruction because "it was an incorrect statement of the law." *Id.*  The Circuit recognized that the majority of courts that have addressed this issue treat Rule 30(b)(6) testimony "'as merely an evidentiary admission, and do

---

[2]    Also, defendants' Reply does not respond to NAFCO's arguments that the summary judgment record presents triable issues about facts supporting its fraud and fraudulent suppression claims premised on these four allegations.

not give the testimony conclusive effect.'" *Id.* (quoting *Templeton v. Catlin Specialty Ins. Co.*, 612 F. App'x 940, 959 n.19 (10th Cir. 2015); then citing *Keepers, Inc. v. City of Milford*, 807 F.3d 24, 35 (2d Cir. 2015) ("[The plaintiff] rightly notes that an organization's deposition testimony is 'binding' in the sense that whatever its deponent says can be used against the organization. But Rule 30(b)(6) testimony is not 'binding' in the sense that it precludes the deponent from correcting, explaining, or supplementing its statements.")). Consistent with this governing law, the court refuses to treat Mr. Parrish's Rule 30(b)(6) testimony as a judicial admission confining NAFCO's fraud and fraudulent suppression claims to the five alleged misrepresentations and omissions he identified in his Rule 30(b)(6) deposition.

*Second*, defendants assert that NAFCO's fraudulent suppression claims fail as a matter of law because Kansas law[3] imposed no duty on them either to disclose or to speak about the information that NAFCO contends they fraudulently suppressed. Defendants correctly assert that Kansas courts have held that a duty to disclose may arise in two situations: (1) when a disparity of bargaining power or of expertise exists between two contracting parties; or (2) the parties are in a fiduciary relationship with one another. *DuShane v. Union Nat'l Bank*, 576 P.2d 674, 679 (Kan. 1978). Defendants argue that neither situation applies to the parties' relationship here.

---

[3]     The parties agree that Kansas law governs the claims asserted in the case. Doc. 79 at 2 (Pretrial Order ¶ 1.d.). Also, the court agrees that Kansas law governs NAFCO's fraud and fraudulent suppression claims. In a diversity case, like this one, the court applies the substantive law of the forum state, including its choice of law rules. *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1170 (10th Cir. 2010) (citation omitted). Kansas courts follow the rule of *lex loci delicti* for tort claims, applying the substantive law of the place where a tort occurred. *Anderson v. Commerce Constr. Servs., Inc.*, 531 F.3d 1190, 1193–96 (10th Cir. 2008); *Ling v. Jan's Liquors*, 703 P.2d 731, 735 (Kan. 1985). Here, NAFCO alleges that Bedeschi and Dearborn—both companies with their principal places of business in Kansas— and their employees (Larry Harp and Braxton Jones) made fraudulent misrepresentations or fraudulent omissions to NAFCO. Kansas law thus governs the fraud and fraudulent suppression claims asserted in this action.

But, as the court already has observed when denying defendants' motion to dismiss the fraudulent suppression claims, Kansas law also imposes a duty on defendants to correct any material misrepresentations, even if no duty exists at the relationship's inception. *See Great Plains Christian Radio, Inc. v. Cent. Tower, Inc.*, 399 F. Supp. 2d 1185, 1196 (D. Kan. 2005) (explaining that, in Kansas, "a defendant who speaks is under a duty not to mislead by disclosing only a portion of the truth" (citing *Sparks v. Guar. State Bank*, 318 P.2d 1062, 1065 (Kan. 1957))). *See also Kan. Waste Water, Inc. v. Allied Techsystems, Inc.*, No. 02-2605-JWL, 2005 WL 1109456, at *18 (D. Kan. 2005) (denying summary judgment against a fraud by silence claim because defendant "owed plaintiffs a duty of disclosure to the extent that disclosure was necessary to prevent [defendant's] affirmative representations from being misleading"). The Kansas Supreme Court has explained:

> Even though one is under no obligation to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells, but also not to suppress or conceal and facts within his knowledge which will materially qualify those stated. If he speaks at all, he must make a full and fair disclosure. Therefore, if one wi[l]lfully conceals and suppresses such facts and thereby leads the other party to believe that the matters to which the statements made relate are different from what they actually are, he is guilty of a fraudulent concealment.

*Sparks*, 318 P.2d at 1066.

Here, NAFCO's Opposition makes clear that its fraudulent suppression claims are premised on defendants' failure to correct alleged material misrepresentations, *i.e.*, that defendants failed to correct their material misrepresentations that Essar had not paid Bedeschi for work on the Essar Project. Doc. 97 at 57–58 (explaining that "NAFCO's fraud-based claims [are] founded upon . . . Defendants' misrepresentations that Bedeschi had not been paid by Essar, along with Defendants' failure to correct these misrepresentations" and "Defendants'

suppression that Dearborn and Bedeschi had, in fact, been paid by Essar, along with Defendants'
failure to correct their prior misrepresentations").

Defendants contend that Judge Lungstrum's decisions in *Great Plains* and *Kansas Waste
Water* are inconsistent with Kansas law.  Defendants cite three Kansas cases where the Kansas
Supreme Court refused to apply the rule announced in *Sparks*.  *See*, *e.g.*, *Gonzales v. Assoc. Fin.
Serv. Co. of Kan., Inc.*, 967 P.2d 312 (Kan. 1998); *DuShane*, 576 P.2d 674; *Timi v. Prescott State
Bank*, 553 P.2d 315 (Kan. 1976).  In each of these cases, the Kansas Supreme Court explained
that the facts of *Sparks* differed from the case at hand because "[i]n *Sparks* there was not only
concealment with regard to a matter about which the bank had a duty to disclose information but
also false statements about existing material fact, known to be false and made for the purpose of
inducing the party to forego action then available to mitigate his damage."  *DuShane*, 576 P.2d at
681.  In contrast, in defendants' three cited cases, the Kansas Supreme Court found no evidence
establishing that the defendants had made any false representations that they failed to correct.
*See*, *e.g.*, *Gonzales*, 967 P.2d at 325 (explaining that *Sparks* was "neither factually nor legally
similar" to plaintiff's case because "*Sparks* involved a bank officer making affirmative
misrepresentations" while plaintiff asserted no misrepresentations but contended that defendant
had a duty to make more disclosures than the ones that it had made); *DuShane*, 576 P.2d at 678–
80 (holding that plaintiff adduced no evidence of fraud based upon false representations about
existing and material facts); *Timi*, 553 P.2d at 325–26 (concluding that "there is no similarity in
the facts here" with *Sparks* because *Sparks* involved "false representations" while *Timi* involved
only "equivocal, vague and indefinite" statements that did not constitute actionable fraud).

Here, the summary judgment facts more nearly resemble *Sparks*, and not the three cases
defendants cite to support their argument that they had no duty to disclose.  NAFCO asserts that

defendants misrepresented to NAFCO that Essar never had paid Bedeschi and that defendants never corrected those misrepresentations when they learned they were untrue. NAFCO has adduced admissible evidence supporting its assertions. The summary judgment record thus precludes the court from entering summary judgment against NAFCO's fraudulent suppression claim.

Last, the court addresses a final argument about NAFCO's fraud-based claims. NAFCO asks the court to enter an Order barring defendants from introducing evidence tending to show: (1) the dates when Bedeschi received Essar's post-June 2016 payments; (2) that NAFCO has no evidence of when Essar made such post-June 2016 payments to Bedeschi; (3) that any post-June 2016 payments were attributable to subcontractors other than NAFCO; and (4) that Bedeschi did not have the financial wherewithal to pay NAFCO after June 2016. NAFCO argues that the court's August 1, 2017 Protective Order, granting in part Bedeschi's Motion for a Protective Order, precluded NAFCO from discovering this information. Doc. 60. In that Protective Order, the court held that testimony about "Bedeschi's financial ability at the time Bedeschi made the alleged misrepresentations is relevant to [NAFCO's] fraud claims and allegations." *Id.* at 2. So, the court denied Bedeschi's request for a protective order in part "to the extent it relates to Bedeschi's financial ability or condition at the time Bedeschi allegedly made the alleged misrepresentations" between September 2015 and July 2016. *Id.* at 2–3. But the court also granted Bedeschi's motion in part, precluding discovery of Bedeschi's finances after July 2016. *Id.*

NAFCO contends that defendants are using the court's Protective Order as both a sword and a shield—*i.e.*, that defendants have used the Protective Order as a shield to prevent NAFCO from discovering information about Bedeschi's finances after June 2016, but now use the Order

as a sword to argue that NAFCO has no evidence to establish when Bedeschi received any post-June 2016 payments.  For several reasons, the court finds no need to grant the relief that NAFCO seeks.  *First*, the Protective Order never prevented NAFCO from discovering information about the timing of Essar's payments to Bedeschi.  Instead, it only precluded discovery of Bedeschi's *financial ability* to pay NAFCO outside the time Bedeschi made the alleged misrepresentations that it could not pay NAFCO until it received payment from Essar.  *Second*, NAFCO, in fact, discovered information about the timing of the Essar payments.  Mr. Jones testified that Bedeschi has received payment from Essar for 39 of the 42 loads that NAFCO delivered to the Essar Project.  He also testified that Bedeschi received the balance of the payment just recently—in the two to three weeks before his July 31, 2017 deposition—and after NAFCO filed this lawsuit.  *Last*, defendants' summary judgment motion does not rely on the type of evidence that NAFCO seeks to exclude.  At least on summary judgment, the court does not find that defendants are using the August 1, 2017 Protective Order as both sword and shield.  The court thus denies NAFCO's request that the court bar defendants from introducing certain evidence.  But it does so without prejudice to NAFCO's ability to reassert this argument at trial under different circumstances.  For example, if defendants try to argue that Bedeschi was financially unable to pay NAFCO after June 2016 (something that they never argue on summary judgment), that argument could implicate the August 1, 2017 Protective Order because it effectively prevented NAFCO from discovering information about Bedeschi's finances after June 2016.  The court defers ruling on this issue unless and until the issue is presented at trial.

## 2.  Damages Claims

Finally, defendants assert that NAFCO's damages claims for lost profits, lost business opportunities, and the entire contract price fail as a matter of law.

*First*, defendants contend that the parties' Contract bars recovery of lost profits. Kansas "follows the general rule that loss of profits resulting from a breach of contract may be recovered as damages when such profits are proved with reasonable certainty, and when they may reasonably be considered to have been within the contemplation of the parties." *Vickers v. Wichita State Univ.*, 518 P.2d 512, 515 (Kan. 1974) (citations omitted). Defendants assert that the parties here never contemplated recovery of lost profits because their Contract precludes such recovery. For support, defendants cite Article 24 of the Subcontract. But that provision only covers suspensions and limits lost profits damages just to "anticipated profit[s] for incomplete work." Doc. 83-4 at 10 ("In all cases, reimbursement to [NAFCO] shall be limited to its actual costs and expenses, without any overhead or anticipated profit for incomplete work."). Defendants also cite Article 25(A) to support their argument against NAFCO's lost profits claim. But that provision applies merely to termination and precludes liability "for any damages or loss of anticipated profits because of such termination." *Id.* at 11. The court does not view either provision to prohibit recovery of lost profits entirely. Instead, the Contract precludes lost profits in limited situations, *i.e.*, lost profits for incomplete work because of a suspension and lost profits because of termination. Defendants make no argument that NAFCO's lost profit claims are confined to the types prohibited by Article 24 and 25(A). And the court cannot reach such a conclusion on the summary judgment record presented here. The court thus declines to enter summary judgment against NAFCO's lost profits damages claim because the Contract only precludes lost profits damages under certain and limited circumstances.

*Second*, defendants argue, even if the Contract permits NAFCO to recover lost profits, the summary judgment record contains no admissible evidence of lost profits or lost business opportunities damages. NAFCO designated its President John Parrish as a Rule 30(b)(6) witness

to testify about certain topics including "NAFCO's alleged damages and the basis therefore."
Doc. 83-6 at 18 (Parrish Dep. 89:8–14).  Mr. Parrish testified that lost profits is one of the types
of NAFCO's asserted damages.  He also testified that he could not provide a specific number for
the amount of NAFCO's lost profits.  Further, Mr. Parrish testified that NAFCO had lost
business opportunities, but he could name only one of those opportunities—the Dominion
project.  He also could not recall the amount of NAFCO's lost profits on the Dominion project.
Defendants argue that Mr. Parrish's testimony fails to establish NAFCO's lost profits and lost
business opportunities damages with any reasonable certainty.  And, for this reason, defendants
contend the court should grant summary judgment against NAFCO's lost profits and lost
business opportunities damages claims.

NAFCO responds, arguing that Mr. Parrish's deposition testimony adequately responded
to defendants' noticed deposition topic and to counsel's questions about damages.  Although Mr.
Parrish could not provide a specific amount for its claimed damages during his deposition,
NAFCO has submitted a Declaration by Mr. Parrish that provides a more specific calculation of
NAFCO's lost profits and lost business opportunities damages by referring to a document titled
"Essar Project Claim for Suspension of Work/Storage of work/Request for Change Order"
("Project Claim") that NAFCO submitted to Bedeschi on May 12, 2016.  Doc. 97-12 ¶¶ 3–6, 15–
18.

Defendants argue that Mr. Parrish's Declaration contradicts his deposition testimony.
Thus, they contend, the court must disregard the contradictory Declaration on summary
judgment.  *See*, *e.g.*, *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986) (explaining that
"courts will disregard a contrary affidavit [conflicting with the affiant's earlier deposition
testimony] when they conclude that it constitutes an attempt to create a sham fact issue").  The

court disagrees with defendants' position.  Mr. Parrish's Declaration never contradicts his earlier deposition testimony.  Mr. Parrish testified that NAFCO had sustained lost profits and lost business opportunities damages, but he was unable to quantify the amount of those damages. His Declaration offers the damages amount that he was unable to provide at his deposition after he had the opportunity to review the Project Claim.  Indeed, Mr. Parrish specifically referred to this document in his deposition testimony as something that could refresh his recollection about what types of damages NAFCO is seeking.  Doc. 83-6 at 21 (Parrish Dep. 136:18–23) (explaining that he would "have to look at" the claim to know if it included itemized lost profits damages).

Defendants assert several other reasons that, they contend, Mr. Parrish's Declaration provides speculative and uncertain evidence of NAFCO's lost profit and lost business opportunities damages.  But all of these arguments go to the weight of Mr. Parrish's testimony, not its admissibility.  The court cannot weigh the evidence on summary judgment.  And, for this reason, the court concludes that the summary judgment record creates a triable issue whether NAFCO has sustained lost profit and lost business opportunities damages.  The court thus denies defendants' summary judgment motion against these damages claims.

*Last*, defendants assert that NAFCO cannot recover damages for the entire Contract price because NAFCO concedes that it has not performed its Contract obligations fully.  Kan. Stat. Ann. § 84-2-709(a) allows a seller to recover "the price . . . of goods accepted."  Defendants argue that the summary judgment facts establish that Bedeschi has not "accepted" all of the goods promised under the Contract because, as Mr. Parrish's testimony conceded, NAFCO has not performed all of its obligations under the Contract.  Also, Mr. Parrish conceded that for the portion of the Contract NAFCO has not performed, NAFCO has avoided certain costs including

labor, variable overhead, materials, and employee fringe benefits.  For all these reasons, defendants contend that NAFCO is precluded from recovering the entire Contract price.

NAFCO's Opposition never responds to defendants' argument that NAFCO cannot recover damages for the entire Contract price.  The court thus assumes that NAFCO has abandoned its damage claim for the entire Contract price—in the amount of $4,637,371.  *See Hinsdale*, 19 F. App'x at 768–69; *see also Liberal Sch. Dist.*, 562 F. Supp. 2d at 1337.  The court thus grants summary judgment against NAFCO's damages claim seeking to recover the entire Contract price.

### 3.  Conclusion

For the reasons explained, the court grants defendants' summary judgment motion in part and denies it in part.  The court grants summary judgment against NAFCO's fraud and fraudulent misrepresentation claims to the extent they are based on the five alleged misrepresentations or omissions that Mr. Parrish testified about in his Rule 30(b)(6) deposition.  The court also grants summary judgment against NAFCO's damages claim for the entire Contract price.  The court denies defendants' summary judgment motion in all other respects.

### B.  Plaintiff NAFCO's Motion for Partial Summary Judgment

The court now turns to NAFCO's Motion for Partial Summary Judgment.  NAFCO's motion asks the court to grant summary judgment against:  (1) Bedeschi's counterclaims for breach of contract and breach of warranty; (2) Bedeschi's declaratory judgment claim; and (3) Bedeschi's affirmative defense asserting setoff.  Also, the motion asks the court to enter summary judgment in its favor on NAFCO's assertion that Bedeschi changed the Contract's "scope of work."  The court addresses each of NAFCO's arguments in the subsections, below.

The court begins with NAFCO's argument that it is entitled to summary judgment in its favor on its assertion that Bedeschi changed the "scope of work" under the Contract.

### 1. NAFCO's Assertion that Bedeschi Changed the "Scope of Work"

NAFCO asserts that the summary judgment facts establish, as a matter of law, that Bedeschi changed the scope of work—as the Contract defines that term—when it suspended and later resumed NAFCO's shipments to the Essar Project. NAFCO thus asks the court to enter summary judgment in its favor on this issue.

Section 5 of the Subcontract Purchase Order Terms and Conditions permitted Bedeschi to change the scope of work, and it required NAFCO to make the changes promptly. Also, it allowed NAFCO to seek a price adjustment from Bedeschi for the changes, provided that it satisfied certain conditions. The Subcontract's Article 17 also permitted NAFCO to change the work and adjust the Subcontract price accordingly, but it required, among other things, that NAFCO submit a claim in writing and Bedeschi approve the price change in writing. Also, the Subcontract incorporated the AISC Code into the parties' Agreement. NAFCO argues that Bedeschi's suspension and resumption of shipments qualifies as a change in work requiring a modification of the contract price, as the AISC Code's provisions define that term. *See* Doc. 85-5 at 76 (AISC Code Sections 9.4.1. & 9.4.3.).

Here, NAFCO does not seek a ruling that it is entitled to damages from any change in the scope of work. Instead, it asks the court to hold, as a matter of law, that Bedeschi changed the scope of work within the meaning of the Contract. For support, NAFCO cites Project Manager Braxton Jones's deposition testimony. Mr. Jones testified as Bedeschi's Rule 30(b)(6) corporate representative. And he testified that Bedeschi's suspension of shipments in December 2015, and

its resumption of shipments on an expedited basis in May 2016, constituted a significant change

to NAFCO's work under the Contract.

Bedeschi responds to NAFCO's argument, asserting that Bedeschi never changed the

"scope of work" under the Contract because the parties never modified the Contract consistent

with its provisions or Kan. Stat. Ann. § 84-2-209(2) & (3).[4]  Indeed, although Section 5 of the

Subcontract Purchase Order Terms and Conditions permitted Bedeschi to change the scope of

the work, it also required that "[a]ny changes to this order shall be made in accordance with

Paragraph 27."  Doc. 83-5 at 2.  And Section 27 provides:  "This Order may only be modified by

a purchase order amendment/alteration issued by [Bedeschi]."  *Id.* at 5.  Also, the Subcontract's

Article 17(b) permitted Bedeschi to change the work "[b]y written order."  *Id.*  Kan. Stat. Ann. §

84-2-209(2) provides:  "A signed agreement which excludes modification or rescission except by

a signed writing cannot be otherwise modified or rescinded . . . ."  And Kan. Stat. Ann. § 84-2-

209(3) applies the statute of fraud requirements to a contract modification.

Here, the uncontroverted facts establish that the parties never changed or amended their

Contract with a signed writing.  But NAFCO asserts that Bedeschi's December 22, 2015 letter

directing NAFCO to suspend shipments and its May 4, 2016 letter directing NAFCO to resume

shipments constitute "written orders" under Article 17(b) that changed NAFCO's work.  The

court cannot find any definition of "written order" in the Contract.  A reasonable jury could

---

[4]      As noted above, the parties agree that Kansas law governs the claims asserted in the case.  Doc.
79 at 2 (Pretrial Order ¶ 1.d.).  Also, Kansas law governs the parties' contract claims under choice of law
rules.  In a diversity case, like this one, the court applies the substantive law of the forum state, including
its choice of law rules.  *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1170 (10th Cir. 2010)
(citation omitted).  In Kansas, courts generally apply the law chosen by the parties to control their
agreement unless doing so would contravene public policy.  *Brenner v. Oppenheimer & Co., Inc.*, 44 P.3d
364, 375 (Kan. 2002).  Here, the Subcontract provides that Kansas law governs.  Doc. 83-4 at 16.  The
Subcontract Purchase Order's Terms and Conditions also provide that Kansas law governs.  Doc. 83-5 at
4.  The court thus applies Kansas law because the parties have chosen Kansas law to govern their
contractual relationship and they also agree that Kansas law governs.

conclude that Bedeschi's communications constituted "written orders" that changed the scope of work. But a reasonable jury also could conclude that the Contract required a "written order" expressly amending or modifying the Contract. On this summary judgment record—when construing the facts in Bedeschi's favor—the court cannot conclude, as a matter of law, that Bedeschi's communications to NAFCO constituted "written orders" sufficient to modify NAFCO's scope of work under the Contract.

Also, the court cannot find that Mr. Jones's Rule 30(b)(6) testimony entitles NAFCO to summary judgment on this issue. Although Mr. Jones testified that Bedeschi changed the Contract's scope of work, his testimony cannot alter the Contract's requirements for modifying the parties' agreement. Whether Bedeschi changed NAFCO's work under the Contract presents a factual issue whether the parties satisfied the Contract's requirements for modification. And the court cannot decide this issue on summary judgment.

Finally, NAFCO's reliance on the AISC Code is unavailing. Although certain provisions of the AISC Code require a contract price modification when changes are made to the contract's scope of work, the AISC Code and its commentary direct that the Code applies "[i]n the absence of specific instructions to the contrary in the *contract documents*" and that the Code "is not intended to . . . change the duties and responsibilities . . . from those set forth in the *contract documents*" or impose duties "inconsistent with the provisions of the *contract documents*." Doc. 85-5 at 14. Here, the parties' Contract includes provisions governing modifications to the scope of work. And this summary judgment record presents factual issues whether the parties have satisfied the Contract's requirements for such modification. The court thus denies NAFCO's summary judgment motion seeking judgment in its favor on its assertion that Bedeschi changed NAFCO's scope of work under the Contract—as the Contract defines this term.

## 2. Breach of Contract and Breach of Warranty Claims

Next, NAFCO asserts that Bedeschi's breach of contract and breach of warranty claims fail, as a matter of law, because Bedeschi has sustained no damages. Also, NAFCO provides a second argument supporting summary judgment against Bedeschi's breach of warranty claim: NAFCO asserts that the breach of warranty claim fails, as a matter of law, because Bedeschi never provided timely notice to NAFCO of any warranty breach. The court addresses each argument separately, below.

### a. Do the Summary Judgment Facts Establish No Genuine Issue Whether Bedeschi Has Sustained Damages to Support its Breach of Contract and Warranty Claims?

NAFCO asserts that the summary judgment facts establish that Bedeschi has sustained no damage from any purported breach of contract or breach of warranty. In Kansas, one of the elements required to establish a breach of contract claim is: "damages to the plaintiff caused by the breach." *Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013). Also, the Kansas Uniform Commercial Code[5] provides that "[t]he measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." Kan. Stat. Ann. § 84-2-714(2).

NAFCO contends that the undisputed summary judgment facts establish that Bedeschi has sustained no damage. Indeed, the summary judgment record reveals that Essar paid

---

[5]     The parties appear to agree that the Kansas Uniform Commercial Code applies to their dispute because both parties cite the Code in their summary judgment papers. Also, as NAFCO explicitly explains, the Kansas Uniform Commercial Code applies to this dispute because the parties' claims and defenses are based on the sale of goods, *i.e.*, fabricated steel. Doc. 85 at 36 n.4 (first citing Kan. Stat. Ann. § 84-2-102 (explaining that "this article applies to transactions in goods"); then citing Kan. Stat. Ann. § 84-2-105(1) (defining "goods" as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (article 8) and things in action")).

Dearborn more than $16 million for the Essar Project. And then Dearborn paid Bedeschi all amounts it has received from Essar. To date, Bedeschi has received payment (from Essar through Dearborn) for 39 of the 42 loads that NAFCO delivered to the Essar Project. Because Bedeschi has received its full Contract price for 39 of the loads that NAFCO delivered, NAFCO contends, Bedeschi cannot establish damages as a matter of law.

Bedeschi responds, arguing that the summary judgment facts create a triable issue about its damages because the August 10, 2017 inspection revealed that NAFCO's fabricated steel did not conform to the parties' Contract. Specifically, Bedeschi contends that the paint thickness is inadequate. And it asserts that the cost to repaint the fabricated steel is about $435,400. Thus, Bedeschi contends, it has come forward with evidence creating a genuine issue whether it has sustained damages from NAFCO's alleged breach of contract and breach of warranty.

NAFCO argues that Bedeschi's damage claim is speculative. It also criticizes Skip Moore's Declaration providing the damage calculation as having insufficient evidentiary quality, *i.e.*, that it does not provide clear and convincing evidence of damages. The court disagrees. NAFCO's attacks on Mr. Moore's damage calculation go to the weight and credibility of this evidence. The court cannot evaluate the veracity of this evidence on summary judgment. Instead, the trier of fact must decide whether Bedeschi's proffered damages evidence supports its breach of contract and breach of warranty claims.

Also, NAFCO contends that Bedeschi has not sustained damages for any painting defects because it has received full payment from Essar—without any deductions for purported painting defects. For support, it cites *BAE Systems Information & Electronic Systems Integration, Inc. v. SpaceKey Components, Inc.*, 941 F. Supp. 2d 197 (D.N.H. 2013). In that case, the New Hampshire court granted summary judgment against a buyer's breach of warranty claim because

the buyer's "resale of the allegedly nonconforming [goods] to its customers for the same amount they would have paid for conforming [goods] establishes that the market value of the nonconforming [goods] was the same as the market value of conforming [goods], which left [the buyer] without any damages resulting from [the seller's] alleged breach of warranty." *Id.* at 218. NAFCO asserts that the same reasoning applies here because Bedeschi has received the full Contract price from Essar for the goods NAFCO delivered to the Essar jobsite.

The court disagrees that the facts here require the same summary judgment result as *BAE Systems*. In that case, it doesn't appear that the buyer ever argued that it had sustained damages for the costs it would incur to cure the defects to the nonconforming goods the seller had delivered to a third party. In contrast, Bedeschi asserts that it has sustained damages in the amount that it will cost to repaint the fabricated steel. But NAFCO argues that the summary judgment record never establishes that Bedeschi owes an obligation to Essar to repaint the fabricated steel or that it even intends to repaint the steel now that Essar is defunct after filing for bankruptcy. For its claims to survive summary judgment, Bedeschi (as the non-moving party) need not prove its damages as a matter of law. Instead, the court only needs to decide whether Bedeschi has shown a triable issue about damages based on the undisputed summary judgment facts viewed in Bedeschi's favor. Here, Mr. Moore's Declaration asserts that Bedeschi has sustained damages for the cost to repaint the goods. The court finds this sufficient to establish a triable fact issue that the jury must decide.

In sum, on this summary judgment record, the court concludes that genuine issues of fact exist whether Bedeschi has sustained damages from NAFCO's alleged breach of contract and breach of warranty. For this reason, the court denies NAFCO's summary judgment motion against these two claims.

          **b.  Do the Summary Judgment Facts Establish No Genuine Issue Whether Bedeschi Provided Timely Notice of a Breach of Warranty?**

NAFCO next argues that Bedeschi's breach of warranty claim cannot survive summary judgment because the undisputed facts establish that Bedeschi never provided NAFCO timely notice of a warranty breach.  Kan. Stat. Ann. § 84-2-607(3)(a) provides:  "Where a tender has been accepted . . . the buyer must *within a reasonable time* after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."  Kan. Stat. Ann. § 84-2-607(3)(a) (emphasis added); *see also Smith v. Stewart*, 667 P.2d 358, 366 (Kan. 1983) ("We agree with the general proposition of law that the giving of notice within a reasonable time to the seller, pursuant to [Kan. Stat. Ann. §] 84-2-607(3)(a), is a condition precedent to filing an action for recovery of damages for breach of implied or express warranties.").  So, in Kansas, "failure to give timely notice, as required in [Kan. Stat. Ann. §] 84-2-607(3)(a), bars the buyer from any remedy."  *Golden v. Den-Mat Corp.*, 276 P.3d 773, 787 (Kan. Ct. App. 2012).  Kansas's "requirement of notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy."  *Dowling v. Sw. Porcelain, Inc.*, 701 P.2d 954, 960 (Kan. 1985).  "By receiving timely notice of an alleged breach the seller is afforded an opportunity to prepare his defenses and govern his conduct accordingly."  *Smith*, 667 P.2d at 363–64 (citation omitted).

NAFCO asserts that this notice requirement applies more stringently here in the commercial context than compared to a consumer setting.  *See* Kan. Stat. Ann. § 84-2-607 cmt. 4 (explaining that the time for a retail consumer to give notice is judged by a different standard than that for a merchant buyer); *see also Golden*, 276 P.3d at 788 ("[T]he courts do not apply the

notice-of-breach obligation as stringently in cases involving consumers as in those between commercial entities.").

NAFCO also asserts that Bedeschi bears the burden "to plead and prove notice within a reasonable time." *Dold v. Sherow*, 552 P.2d 945, 947 (Kan. 1976). And, NAFCO contends, Bedeschi has done neither one.

The court agrees Bedeschi never has pleaded notice. Indeed, Bedeschi's Counterclaim includes no allegations of notice. *See generally* Doc. 41. And, although the Pretrial Order[6] asserts that NAFCO breached its warranty by improperly painting the fabricated steel, Doc. 79 at 12 (Pretrial Order ¶¶ 3.20., 3.21., 3.24., 3.26.), it never asserts that Bedeschi gave NAFCO notice of a breach. But nonetheless, the court declines to grant summary judgment based on a pleading deficiency.

Kansas courts have allowed parties to amend their pleadings to allege notice when the pleadings failed to include facts establishing notice. *See Dowling*, 701 P.2d at 960–61 (recognizing that a buyer's oral notice of breach constitutes sufficient notice under Kansas law and "[i]f the parties wish to amend their pleadings to reflect the giving of notice and perhaps to dispute the receipt of that notice, the trial court may make appropriate orders as required."); *see also Massey Ferguson Credit Corp. v. Umbarger*, No. 88-4056-S, 1989 WL 35983, at *2 (D. Kan. Mar. 17, 1989) (granting buyers leave to amend their counterclaim to plead notice because Rule 15 requires courts to grant leave "'freely . . . when justice so requires'" (quoting Fed. R. Civ. P. 15(a))). For the same reasons, the court grants Bedeschi leave to amend its Factual Contentions in the Pretrial Order to include allegations of notice.

---

[6]    The Pretrial Order now controls the action and supersedes the pleadings. *See* Fed. R. Civ. P. 16(d) (explaining that the Pretrial Order "controls the course of the action unless the court modifies it"); *see also Weyerhaeuser Co. v. Brantley*, 510 F.3d 1256, 1267 (10th Cir. 2007) ("The subsequent pretrial order supercedes the pleadings.").

The court also rejects NAFCO's argument that the summary judgment facts establish, as a matter of law, that Bedeschi cannot prove that it gave reasonable notice. NAFCO asserts that Bedeschi never has given it notice that the fabricated steel it delivered to the Essar Project jobsite was nonconforming. Bedeschi disagrees. It contends that it provided the requisite notice on August 23, 2017, when it delivered the Inspection Report showing that the steel's paint thickness is inadequate and not within the Contract's specifications. Bedeschi contends this notice was timely because it had inspected the goods on August 10, 2017, Mr. Moore prepared the inspection report on August 16, 2017, and Bedeschi provided the Inspection Report to NAFCO only seven days later and a month before discovery closed. Although NAFCO had delivered the goods to the Essar Project jobsite in June and July 2016, Bedeschi asserts that did not have a reasonable opportunity to inspect the goods earlier because it did not have the time to do so. Bedeschi asserts that Essar declared bankruptcy in July 2016, and afterward Bedeschi did not have access to the jobsite until it secured permission on August 3, 2017, to enter the jobsite and inspect the goods. Yet, Bedeschi also concedes that Essar never denied it the ability to inspect the goods at the Essar Project jobsite. Nevertheless, Bedeschi asserts that these facts give rise to a genuine material issue whether it provided the requisite notice. And, it contends, the jury must decide this issue. The court agrees.

In Kansas, "[w]hether a buyer notifies a seller of a breach of warranty within a reasonable time is a question of fact to be determined from all the facts and circumstances." *GFSI, Inc. v. J-Loong Trading, Ltd.*, 505 F. Supp. 2d 935, 939 (D. Kan. 2007) (citing *Brunner v. Jensen*, 524 P.2d 1175, 1185 (Kan. 1974)). *See also Signature Mktg., Inc. v. New Frontier Armory, LLC*, No. 15-7200-JWL, 2016 WL 5409996, at *11 (D. Kan. Sept. 28, 2016) ("Kansas courts commonly consider determinations of reasonable time under § 2-607(3)(a) and under the UCC generally to

be within the province of the factfinder." (citing *Golden*, 276 P.3d at 788)); *AgriStor Leasing v. Meuli*, 634 F. Supp. 1208, 1221 (D. Kan. 1986) (holding that the summary judgment record presented a "legitimate question of fact" whether the buyer put the seller on sufficient notice of breach of warranty and thus precluded summary judgment); *Golden*, 276 P.3d at 788 (concluding that the trial court should have left for the jury the issue "whether [the buyer] provided notice of breach within a reasonable time under [Kan. Stat. Ann. §] 84-2-307(3)(a)").

NAFCO argues that these cases differ from the facts here because they are "almost entirely . . . arising in the consumer context." Doc. 102 at 26. Although some of the cases that Bedeschi cites for this point of law involve the consumer setting—where the notice requirements are less stringent—several of them involve commercial disputes, like the one here. *See, e.g.*, *Signature Marketing, Inc.*, 2016 WL 5409996, at *1–2 (denying summary judgment against a breach of warranty claim because fact issues existed whether the buyer gave the seller reasonable notice of the breach in a case involving an agreement by the Kansas corporation seller to manufacture and provide custom firearm component parts to buyers who were firearms dealers, distributors, and manufacturers); *GFSI, Inc.*, 505 F. Supp. 2d at 937–38 (concluding, after a bench trial, that the facts established that a buyer gave reasonable notice of a breach to the seller when the buyer was a Delaware corporation that sued the Hong Kong limited company seller for supplying defective garments). So, even applying a stricter standard in the commercial context, the court cannot decide on summary judgment whether Bedeschi provided reasonable notice if that determination involves disputed issues of fact.

NAFCO also contends that neither Bedeschi's counterclaim nor its August 23, 2017 service of the Inspection Report constitute sufficient notice under Kansas law. Citing dicta from the Kansas Supreme Court, NAFCO argues that a buyer cannot provide requisite notice of a

breach through a lawsuit because "[c]ertainly the purpose of [Kan. Stat. Ann. §] 84-2-607(3)(a)

. . . would be thwarted if, for example, a buyer purchased an automobile and two years later, out

of the blue, filed an action for breach of warranty stating the vehicle had never operated

properly." *Smith*, 667 P.2d at 366. The court refuses to convert this observation into a blanket

prohibition against breach of warranty claims premised on notice provided for the first time with

the filing of a lawsuit. Indeed, other Kansas federal cases have not applied such a rule. *See*, *e.g.*,

*Nieberding v. Barrette Outdoor Living, Inc.*, 302 F.R.D. 600, 613 (D. Kan. 2014) (observing that

plaintiff "gave notice about the alleged defect . . . when he filed his initial complaint" (citing

*Graham by Graham v. Wyeth Labs., a Div. of Am. Home Prods. Corp.*, 666 F. Supp. 1483, 1500

(D. Kan. 1987)); *AgriStor Leasing*, 634 F. Supp. at 1220–21 (holding that a "legitimate question

of fact" existed whether the buyer gave sufficient notice of a breach of warranty by filing the

lawsuit); *Wyeth Labs.*, 666 F. Supp. at 1500 ("[B]y filing this lawsuit the defendant was given

sufficient notice, under [Kan. Stat. Ann. §] 84-2-607, of the alleged breach of warranty.").

Considering this authority, the court cannot grant summary judgment for this reason.

Also, citing a Tenth Circuit case, NAFCO contends that the court can decide on summary

judgment whether Bedeschi provided sufficient notice. Doc. 102 at 27 (citing *Rajala v. Allied

Corp.*, 919 F.2d 610 (10th Cir. 1990)). But the summary judgment facts of *Rajala* differ

significantly from the ones here. In *Rajala*, the buyer "was unable to direct [the court's]

attention to any evidence in the record demonstrating that it notified [the seller] that it regarded

delivery of the off-grade resin to constitute a breach." *Id.* at 636. Because the record contained

no fact "upon which a reasonable jury could properly find that [the buyer] rejected the off-grade

resin tendered by [the seller] because it was in violation of the asserted oral contract or otherwise

notified [the seller] that it regarded delivery of such goods as a breach of the asserted oral

51

contract," the Circuit affirmed the district court's directed verdict for the seller against the buyer's breach of contract claim.

In contrast, here, Bedeschi has identified summary judgment facts that permit a reasonable jury to conclude that it provided timely notice to NAFCO of a breach. The court acknowledges the tardiness of Bedeschi's notice provided on August 23, 2017. Indeed, it served NAFCO with the Inspection Report some 20 months after NAFCO first delivered the goods to the Essar jobsite in November and December 2015. NAFCO suggests that the court can infer from Bedeschi's actions that it has manufactured reasons that it need not comply with its contractual obligations. NAFCO calls Bedeschi's breach of warranty claim "nothing more than a drummed up excuse not to pay its bills." Doc. 102 at 34. The court agrees that a reasonable jury could make such an inference. But a reasonable jury also could credit Bedeschi's explanation for the timing of its notice and find that it was reasonably timely under the facts here. Both sets of inferences require factual determinations that the jury must decide—not the court on summary judgment. For this reason, the court denies NAFCO's summary judgment motion against Bedeschi's breach of warranty claim.

### 3. Declaratory Judgment and Setoff Claim

Last, NAFCO seeks summary judgment against Bedeschi's declaratory judgment claim that it is entitled to a setoff and its affirmative defense asserting setoff. NAFCO argues that Bedeschi cannot seek a setoff for three reasons: (1) Bedeschi has not sustained any damage to offset from its liability; (2) Bedeschi failed to give timely notice of its intent to seek a setoff; and (3) Bedeschi never provided timely notice of a breach of warranty. The court already has addressed the first and third arguments above. The court has concluded that fact issues preclude it from deciding on summary judgment whether Bedeschi has sustained damages or whether it

provided timely notice of a breach of warranty. And, for the same reasons, the court cannot grant summary judgment against Bedeschi's setoff claim based on either NAFCO's first or third argument.

Addressing the second reason that NAFCO contends it is entitled to summary judgment against Bedeschi's setoff claim, NAFCO argues that Kansas law requires Bedeschi to provide notice of its intent to seek a setoff. And, NAFCO contends, the summary judgment facts establish that Bedeschi never has provided the requisite notice. Kan. Stat. Ann. § 84-2-717 provides: "The buyer *on notifying the seller of his intention to do so* may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract." *Id.* (emphasis added).

Bedeschi responds to NAFCO's summary judgment argument by asserting that the parties' Contract provides a right to setoff separate and apart from the setoff right in Kan. Stat. Ann. § 84-2-717. Indeed, Section 22 of the Purchase Order Subcontract's Terms and Conditions provides:

> Setoff
> *In addition to any right of set-off provided by law*, all amounts due [NAFCO] shall be considered net of indebtedness of [NAFCO] to [Bedeschi] and its subsidiaries; and [Bedeschi] may deduct any amounts due from [NAFCO] to [Bedeschi] and its subsidiaries from any sums due or to become due from [Bedeschi] or its subsidiaries to [NAFCO].

Doc. 83-5 at 4 (emphasis added). And the Kansas Uniform Commercial Code permits the parties to vary the effect of the Code's provisions by agreement. *See* Kan. Stat. Ann. § 84-1-302 ("[T]he effect of the provisions of the uniform commercial code may be varied by agreement."). Bedeschi asserts that the parties did just that here by including the setoff provision in the Contract—one that includes no notice requirement. The court agrees that the parties' Contract here provides a "separate and additional setoff procedure" that is enforceable separate and apart

from the setoff right provided by Kan. Stat. Ann. § 84-2-717.  *See Magid Glove & Mfg. Safety Co., LLC v. Tower Int'l, Inc.*, No. 11-CV-11791, 2012 WL 5821814, at *7–9 (E.D. Mich. May 1, 2012) (rejecting a buyer's argument that the contract's setoff procedure was invalid under the Michigan Uniform Commercial Code because the parties had the freedom to contract to include a setoff procedure separate from the Michigan statutes).

Also, even if the Kansas statute's notice requirement applies, our court has recognized that notice of an intent to seek a setoff provided for the first time through a lawsuit's complaint can constitute sufficient notice under Uniform Commercial Code § 2-717.  *Mo. Highways & Transp. Comm'n ex rel. Buildex, Inc. v. W. Ready-Mix, Inc.*, No. 14-4037-JWL, 2015 WL 4077594, at *3 (D. Kan. July 6, 2015) (citing *McDowell Research Corp. v. Tactical Support Equip., Inc.*, No. 08-CV-6499, 2009 WL 2901594, *8 (W.D.N.Y. Sept. 4, 2009)).  Indeed, Bedeschi provided such notice here by asserting setoff in its Answer and Counterclaim.  Doc. 41 at 8, 19.

For all these reasons, the court denies NAFCO's summary judgment motion against Bedeschi's declaratory judgment claim for setoff and its affirmative defense asserting the same.

## IV.    Conclusion

For the reasons explained above, the court grants defendants' Joint Motion for Partial Summary Judgment (Doc. 82) in part and denies it in part, as explained more fully in this Order. Also, the court denies plaintiff's Motion for Partial Summary Judgment (Doc. 84).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Joint Motion for Partial Summary Judgment (Doc. 82) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** plaintiff's Motion for Partial Summary Judgment (Doc. 84) is denied.

**IT IS SO ORDERED.**

**Dated this 14th day of May, 2018, at Topeka, Kansas.**

<u>s/ Daniel D. Crabtree</u>
**Daniel D. Crabtree**
**United States District Judge**